BANK OF MOUNTAIN VIEW, a Corporation, Appellant, v. WM. WINE-BRENNER ET AL.—No. 39716.—195 S. W. (2d) 486.

Court en Banc, June 10, 1946.

*Wm. D. Roberts* for appellant.

*A. W. Landis* and *Embry & Embry* for respondents Wm. Winebrenner, A. C. Pottle, W. E. Johnson, P. M. Ritchie, J. L. Bay, J. E. Shandy and V. E. Clemmons.

HYDE, J.—This case was transferred from the Springfield Court of Appeals upon dissent of one of the Judges. [Bank of Mountain View v. Winebrenner, 189 S. W. (2d) 429.] Reference is made to the opinion filed in the Court of Appeals for a full statement of the pleàdings and evidence.

Plaintiff sued on the following note:

Plaintiff's Exhibit "A".

"$1500.00. Mountain View, Mo., Sept. 12, 1939.

"Six months after date, for value received, I, we, or either of us, promise to pay to the order of the

BANK OF MOUNTAIN VIEW, at its office in

Mountain View, Mo.

Fifteen Hundred and no/100 Dollars

with interest at the rate of eight per cent, per annum, from date until paid.

"Interest payable annually, and defaulting interest to draw same rate of interest as principal. The makers, endorsers and guarantors of this note guarantee to pay all costs of collecting, including a reasonable attorney's fee if suit is brought hereon. We hereby severally waive presentment of payment, notice of non-payment, protest and notice of protest, and diligence in bringing suit against any

party hereto, and sureties consent that time of payment may be extended without notice hereof. To secure the payment of this or any other liability or liabilities of ours to said Bank, due or to become due, or that may hereafter be contracted we have hereto attached as collateral security, the following: one note $400.00, one $196.66 and one $1500.00. All dividends and maturing coupons pending life of this loan shall be paid to holder of this note.

"The above collateral has a market value of $2000.00. If in the judgment of the holder of this note, said collateral depreciates in value, the undersigned agrees to deliver when demanded additional security to the satisfaction of said holder; otherwise, this note shall mature at once. Any assignment or transfer of this note, or other obligations herein provided for, shall carry with it the said collateral securities and all rights under this agreement.

"And we hereby authorize —————————— his assigns, or the legal holder hereof, on default of payment of note or any part hereof, according to the terms hereof, to sell said collateral or any part thereof, at public or private sale and with or without ▮▮▮ notice, and by such sale the pledger's right of redemption shall be extinguished.

"MOUNTAIN VIEW WALKER AUCTION CLUB,

"P. O. Address ——————————. By Wm. Winebrenner, Mgr.

"No. 1759. Due Mar. 12, 1940."

Defendants claim that another note held by plaintiff was the real contract between the parties. The other note (referred to as the prorata note) was as follows:

DEFENDANT'S EXHIBIT ONE.

"$1500.00 Mountain View, Mo. Sept. 1, 1939.

"Six months after date, for value received, we promise to pay to Mnt. V. L. S. Mkt. or order, the sum of

Fifteen Hundred & No/100 Dollars

with interest at the rate of eight per cent per annum from DATE until paid.

"Payable at the BANK OF MOUNTAIN VIEW,

Mountain View, Mo.

"Interest payable annually, and defaulting interest to draw same rate of interest as principal. We, the makers, endorsers and guarantors of this note hereby severally waive presentment for payment, notice of non-payment, protest and notice of protest and diligence in bringing suit against any party hereto, and consent that the time of payment may be extended without notice thereof, and guarantee the payment of all costs of collecting, including a reasonable attorney's fee if not paid at maturity.

"It is further agreed that if and when it becomes necessary for the signers of this note to pay off, each shall be liable for a prorata portion of the amount due on the note in the same ratio as units held compare to the total amount of units outstanding.

"It is further agreed that if any of the unit holders should for any reason not pay their portion, then and in that case the remainder of the signers of this note shall share as above stated in the payment. of this portion.

"*We hereby authorize the trustees of the Mtn. V. Live Stk. Mkt. to use this note as collateral* in securing of finances for the operation of Mtn. View Live Stk. Mkt. together with other property owned by said club. No. ———— Due Mar. 1, 1940.

"F. P. Walker, A. Miller, W. E. Johnson, A. R. Potts, Wm. Winebrenner, P. M. Ritchie, C. N. Shinn, V. F. Varvey, J. L. Bay, Earl Sigler, Elmer Jackson, J. E. Shandy, V. E. Clemmons, A. C. Pottle, V. J. Smith, T. E. Allen, M. L. Landrum."

(Foregoing exhibit is endorsed on back thereof as follows:

"Mountain View Live Stock Market,

"P. M. Ritchie,

"Chairman of Board of Trustees.")

The situation is that plaintiff sued on the note signed by the manager as the general obligation of the Association and its members. Defendants defend on the ground that this note was not the principal debt, and that the prorata note (which they offered in evidence) was the real contract between the Association and the Bank. The Association (which had only been in existence from 60 to 90 days prior to September 1, 1939) owed the Bank more than one thousand dollars when the prorata note was made. (The Bank held its notes for this amount and apparently there was also an overdraft.) The Association "was organized for the purpose of making a profit by its members." The original intention was to incorporate it but that was not done. Members were interested in proportion to units issued (there were 500 units outstanding) but it was not shown whether or not anything had been paid for these units.

Defendants undertook to establish the affirmative allegations of their answer, to the effect that the prorata note was the real and only agreement with the Bank, by only three witnesses: Mr. Ritchie, cashier of the Bank; Mr. Winebrenner, the manager of the Association; and Mr. Shandy, a signer of the note.

Mr. Ritchie testified on direct examination that shortly before September 1st, there was a meeting of the unit holders, and that he "informed the members of the organization that they had an overdraft at the Bank and we would have to arrange to take care of it." He further said: "Some of them wanted to know who would sign the note and how to make it, and I agreed with the rest of them that I didn't want to sign the note as an individual as ▮▮▮ I might

be liable for the whole thing. Then I suggested, 'Would any of you be willing to sign a note payable prorata in proportion to the stock you hold in comparison to the amount of stock outstanding?' and a number of them agreed to it. . . . I explained to each of them if we borrowed $1500.00 and there were 500 units outstanding that would be $3.00 per unit each one would be liable for, and practically everyone there agreed that would be satisfactory. . . . The unit holders there wouldn't sanction a loan—there wouldn't be any of them sanction a loan that they would be individually liable on, or for the full amount.''

He prepared the prorata note and it was taken around for signature. He said: ''I explained what it meant and how it would be used, and that they would only be liable for their proportionate part; and that it *would be used as collateral to borrow money on there at the bank.* . . . Q. Now then, Mr. Ritchie, why was this note, designated as Defendants' Exhibit One, taken and retained by the Bank? A. *As collateral to the note sued on.''* He further stated: ''Prior to the time this transaction was consummated I discussed this matter with Mr. M. L. Landrum. I discussed it with Mr. M. L. Landrum and one or more of the other directors of the bank. . . . I did talk to one of the other directors besides Mr. Landrum—possibly two or three of them, at different times. I told them that this proposed loan was to be made on the basis of prorata liability only. They sanctioned that.''

On cross-examination, the following appears: ''Q. So you made no agreement with the defendants whereby they would be liable on plaintiff's Exhibit ''A'' as shown on the face of that note? A. I explained to them that if they would make this note here—the prorata note, I *would take that and use it as collateral.* . . . And if they had to pay the note they would have to pay it in prorata proportion, according to the prorata note. Q. When you took plaintiff's Exhibit 'A' you took it as the note of these defendants, didn't you, under their trade name of Mountain View Walker Auction Club? A. I took it on the authority of the prorata note, granting Mr. Winebrenner the privilege of signing the note for the convenience of handling the note on the books of the bank.'' Certainly Mr. Ritchie's testimony taken as a whole does not completely contradict the provision in the prorata note stating that it was to be used as collateral.

Mr. Winebrenner testified on direct examination as follows: ''Well, he explained it to me, just as he had to us—to take it out and get the boys to sign it and then the loan would be made through the bank and *that would be used as collateral.''*

He did say as to signing the note sued on: ''I objected to it a right smart bit before I ever signed it; I didn't want to put my name on something I wasn't supposed to. I signed it because of his statement that he had to have it to satisfy the bank examiner. He said he

had to have it." However, on cross-examination he further testified: "As to me knowing that the note I took in there signed by all the defendants was to be used as collateral for the note which I signed as manager of the Mountain View Walker Auction Club, I can answer in my own words: I understood he had to have both notes to make the loan. That's the only way I can answer it. As to knowing that the so-called prorata note was to be used as collateral to the note which I signed as manager of the Mountain View Walker Auction Club, *I understood that both notes had to go together or they wasn't worth the paper they was wrote on.*" He also said: "I explained the terms of the note as to it being a prorata note. I didn't know that by the express terms of. this note, Defendant's Exhibit One, that it was to be used as collateral to a note made for the loan. I didn't know another note was to be made. I thought that was the only note they would use." These self-contradictory statements at least do not help defendants, who had the burden of proof, to establish the contrary of what their witness Ritchie said the transaction was.

Mr. Shandy's testimony merely was that he understood that the note was on a prorata ▆▆▆ basis, but that he saw a good many others had signed it and signed it without knowing the exact conditions of the note.

▆▆ It seems very doubtful that this oral evidence of defendants (even if admissible) is substantial evidence to show that the prorata note (instead of the note sued on herein) was the principal debt. It indicates instead that the prorata note was intended (just as it provided) as collateral to such obligations of the Association as its trustees might incur; and that the prorata note was only an agreement of the defendants between themselves and their Association (as the prorata note plainly shows) and not an agreement with the Bank. Nor can it be overlooked that the actual transaction was mainly for the purpose of renewing an existing indebtedness of the Association.

However, we do not think that this oral evidence was admissible to contradict the terms of the written agreement, if it can be construed to have that effect. The prorata note was made to the Association, and not to the Bank, and it very clearly authorized the trustees of the Association to use it as collateral in securing funds to operate the Association. To permit oral evidence to show exactly the contrary (that the prorata note was to be the principal and only debt to the Bank) would violate the parol evidence rule. [See 32 C. J. S. 784, Sec. 851, 20 Am. Jur. 958, Sec. 1099.]

▆▆ Defendants to justify admission of such parol evidence contend that the note sued on was an accommodation note given to plaintiff without consideration to deceive the bank examiner as to the true nature of the transaction. (So that it would appear to be the principal note with the prorata note only as collateral to it when according to defendants the prorata note was the only obligation.) However,

"no one can be an accommodation maker of a note given for his own debt." [Columbian National Life Ins. Co. .v. Dubinsky, 349 Mo. 299, 160 S. W. (2d) 727; See also Sec. 3045, R. S. 1939, Mo. Stat. Ann.] Clearly the note sued on was for the debt of the Association. Its old notes and overdrafts were taken up and any additional funds obtained went to it. How could it then be said that there was no consideration for. this new note? Defendants seem to overlook the fact that the note sued on is the only note of the Association and that it was the party who actually got plaintiff's money. The prorata note is not the note of the Association. It is only the note of the seventeen individuals who signed it. This is the answer to the contention that it was not the type, of security which could be used as collateral. (Because one cannot use his own note as collateral to his own note, discussed in the opinion of Vandeventer, J. in the Court of Appeals.) By signing the prorata note, each of the seventeen signers undertook to become individually liable for a certain proportion of the debt of all of the partners in the Association to plaintiff. [See 41 Am. Jur. 588, Sec. 71.] Therefore the prorata note could properly be collateral to the note of the Association.

What defendants are actually trying to do is to offer the prorata note in evidence as showing the real contract between their Association and plaintiff and then to show by oral evidence that the real agreement was just the opposite of what the prorata note specifically said it was. In other words, they offer a note made to their Association, with authority written in it to their trustees to use it as collateral in securing its finances, and then seek to show by oral testimony that it was the sole direct obligation given to plaintiff to take up notes and overdrafts which were then due from their Association to plaintiff and to obtain additional funds for it. Surely the parol evidence rule prohibits them from relying on this written instrument and at the same time thus varying its terms by parol evidence. This rule "is not merely one of evidence, but it is one of positive substantive law founded upon the substantive rights of the parties." [Sol Abrahams & Son Const. Co. v. Osterholm, 136 S. W. (2d) 86, citing Am. Jur.] Such evidence would go far beyond merely explaining a purpose, which the instrument does not explain, and would directly contradict the written agreement in the note. It would show that the agreement stated in the very instrument upon which defendants rely was not made, but that an exactly opposite agreement was made. There is no contention here that the prorata note did not contain the correct agreement of the parties as a result of any fraud or mistake. Defendants rely upon the testimony of the man who prepared it and claim that it shows the true contract. We hold that when defendants rely on the prorata note to prove what the contract was, they are bound by what this note said it was.

██ Part of the trouble in this case is that it was not tried on all the issues raised by the pleadings, but only on one issue raised in the answer (referred to as a plea in abatement), namely: whether defendants could all be sued in the same suit or whether each had to be sued separately. The jury's verdict was for defendants ''on their plea in abatement'', and they found in their verdict ''that the obligation of said defendants to plaintiff was several and not joint.'' This so-called plea in abatement actually was a plea of misjoinder of defendants. It was properly raised in the answer because it did not appear on the face of the petition. [Essen v. Adams, 342 Mo. 1196, 119 S. W. (2d) 773.] Section 922 (R. S. 1939) Mo. Stat. Ann. ''makes a defect of parties cause for demurrer, but does not in terms make misjoinder a cause. However, a misjoinder of parties plaintiff is ground for demurrer for the reason that in such case the petition does not state a cause of action. Akins v. Hicks, 109 Mo. App. 95, 83 S. W. 75; Barbour on Pleadings to Actions (2d Ed.) 459.'' [Fadler v. Gabbert, 333 Mo. 851, 63 S. W. (2d) 121; see also 1 Am. Jur. 25, Sec. 11; 1 C. J. S. 138, Sec. 101; Moffett v. Commerce Trust Co., 354 Mo. 1098, 193 S. W. (2d) 588; as to raising misjoinder of parties defendant by answer see Mann v. Doerr, 222 Mo. 1, 121 S. W. 86. There are two kinds of misjoinder of parties defendant: ''namely, (1) Where all of the defendants are improperly sued, and (2) Where one or more are properly sued, and the others are improperly joined with them.'' [Pomeroy's Code Remedies (5th Ed.), p. 312, Sec. 190.] The first kind of misjoinder is where the action is entirely misconceived and no case can be made against any of the defendants on the cause of action sought to be maintained. That is the situation claimed here because defendants contend that none of them are liable on the note sued on. In short, this kind of a claim of misjoinder goes to the whole merits of plaintiff's case. However, in the trial of this case, plaintiff was restricted very narrowly to the one issue of whether or not the defendants were liable jointly on the prorata note.. Defendants call this a trial of their plea in abatement, which was and could only have been raised as one of the defenses in their answer; and the trial court would not admit evidence offered by plaintiff on other issues raised by the answer and reply. This was erroneous because it required a determination of all the issues raised by the pleadings to determine the issue raised by the so-called plea in abatement. In other words, the issue of misjoinder could only be determined by deciding which note was the principal obligation, and this issue went to the entire merits of the case.

██ Not to be overlooked either is the provision of the prorata note ''that if any of the unit holders should for any reason not pay their portion, then and in that case the remainder of the signers of this note shall share as above stated in the payment of this portion.'' Might not this be construed as making the prorata note joint and sev-

eral, because under this provision any one of the signers of this note might be liable to pay the whole debt if all of the others failed to pay? Furthermore, does not the general unrestricted endorsement of the prorata note by the Association to plaintiff impose the same liability upon all the members of the Association as the note sued on would impose? It would seem that, even if defendants could get out from under liability on the note sued on, they would find themselves in exactly the same spot by being liable as partners in the Association on its general endorsement of the prorata note to plaintiff.

However, the question of how this prorata note might be collected (whether ▉ by separate suits at law or a joint suit at law or in equity) is not now before us for decision, because the Bank had the right (as it has done) to sue on the principal debt instead of first seeking satisfaction from the collateral. ''The obligation of the debtor to respond in his person and property is the same as if no security had been given, and upon default in payment, the pledgee may elect to sue the pledgor for his debt, without a sale of the security, and may recover a judgment in such suit against the pledgor for the amount of the debt, without destroying or in the least affecting his lien on the property pledged.'' [41 Am. Jur. 654, Sec. 99.] We do not undertake to discuss the rule concerning knowledge of the sole officer of a corporation handling a transaction as being the knowledge of the corporation (as to which there were conflicting opinions in the Court of Appeals) because of our view of the application of the parol evidence rule and because Ritchie said he discussed this transaction with the President and other members of the Board of Directors, and that they sanctioned it. However, that could only mean that they sanctioned taking the prorata note as it was actually written, as a note payable to the Association with its very clearly stated purpose of authorizing the trustees of the Association to use it as collateral. Therefore, even if we construe both notes together as defendants suggest, we still have only the agreement of the signers of the prorata note that it was to be used as collateral by the trustees of the Association in obtaining a renewal of their past debts and funds for future operations. This certainly contemplated that the funds were to be obtained on some other instrument or obligation to which the obligation of the signers of the prorata note was to be collateral.

The judgment is reversed and the cause remanded for trial on the merits of all the issues, raised by the pleadings, as to whether defendants are liable on the note on which plaintiff brought suit.

All concur except *Gantt, J.,* not sitting.